UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11455-RGS

JAMES A. McISAAC

v.

CSX TRANSPORTATION, INC.

MEMORANDUM AND ORDER ON THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT

October 30, 2012

STEARNS, D.J.

On February 16, 2009, plaintiff James A. McIsaac, a conductor employed by defendant CSX Transportation, Inc. (CSX), fell while working at CSX's Mansfield, Massachusetts rail yard. At the time of the accident, McIsaac was approaching his train's locomotive from the rear, which required his crossing a trestle walkway made of wooden planks spanning a small culvert. As McIsaac put his weight on the edge of the walkway, one of the wooden planks pivoted, causing him to fall backwards. The fall twisted his lower back. Despite ongoing orthopedic treatment for lower back pain, McIsaac has not returned to work.

Seeking compensation for his back injury, McIsaac brought this action under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, alleging that

CSX was negligent in failing to maintain a reasonably safe work environment. CSX now moves for summary judgment, arguing that McIsaac has failed to establish a prima facie case of negligence. For the reasons stated below, the motion will be denied.[1]

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* Rule 56 "mandates the entry of summary judgment . . . upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

[1] Also before the court is McIsaac's "Cross-Motion for Summary Judgment" seeking a ruling on the issue of the legal effect of release and settlement agreements entered by McIsaac in prior accidents involving similar injuries. As a favorable ruling on the motion would not be dispositive of McIssac's FELA claim, it is more appropriately treated as an opposition to one of the grounds raised by CSX's motion for summary judgment.

the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Federal Employers' Liability Act imposes a nearly strict form of liability on railroads whose employees suffer injuries "resulting in whole or in part from the negligence of . . . [the] carrier, or by reason of any defect of insufficiency, due to its negligence, in its . . . roadbed . . . or other equipment." 45 U.S.C. § 51. To recover under the Act, a railroad employee "must prove the traditional common law elements of negligence – duty, breach, damages, causation, and foreseeability." *Stevens v. Bangor and Aroostook R.R. Co.*, 97 F.3d 597, 598 (1st Cir. 1996), citing *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 6 (1st Cir. 1987). "Specifically, he must show that his employer breached its duty to maintain a safe workplace, that he was harmed by that breach, and that the harm was foreseeable." *Id.* An employer breaches its duty to provide a reasonably safe workplace when it knows or should have known of a potential danger in the workplace and yet fails to exercise reasonable care, *see id.*, and will be liable for injuries to employees caused in any part by its breach, *CSX Transportation, Inc. v. McBride*, 131 S.Ct. 2630, 2634 (2011) (construing *Rogers v. Missouri Pacific R.R. Co.*, 353 U.S. 500 (1957)).

CSX contends that McIsaac is unable to prove negligence. Specifically, CSX argues that: (1) there is no evidence that it had actual or constructive knowledge of the unsecured plank involved in McIsaac's accident; and (2) the medical evidence

3

establishes that McIsaac's damages stem from preexisting conditions for which he has released CSX from liability. The court is unconvinced.

*Breach*

CSX properly argues that negligence cannot be predicated solely on the fact that a bridge plank was defective. Under familiar law, a defendant generally cannot be held liable for negligence unless it knew or should have known of the hazard that caused a plaintiff's injury. *See, e.g.*, *Gallose v. Long Island R.R.*, 878 F.2d 80, 85 (2d Cir. 1989); *Miller v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 317 F.2d 693, 695 (6th Cir. 1963). CSX relies on the expert testimony of Joseph Lydick that Federal Railroad Administration (FRA) regulations require a railroad's track inspectors to inspect bridges only for "obvious" defects.[2] Lydick Dep. 32:18-33:3. It also relies

---

[2] While FRA regulations do not require track inspectors to inspect bridge walkways, *see* 49 C.F.R. 213, CSX properly concedes that the absence of a specific regulation does not absolve a railroad entirely of the duty to inspect its bridges. As Lydick testified, despite the FRA regulations:

> It has never changed that track inspectors have always been looked at as the eyes and ears of the railroad.
>
> Anything going out on the railroad, whether it's something on a grade crossing that's not covered by Part 213 [of the FRA regulations], vandalism that's not covered by Part 213, or other situations that they see, they're supposed to report it or take action.

Lydick Dep. 35:21-36:4. In fact, CSX does perform annual inspections of its bridges. *See* Pl.'s Opp. - Ex. F.

to a lesser degree on McIsaac's own testimony that prior to the accident he had seen nothing amiss with the trestle's planking. McIsaac Dep. 131:10-22.[3] This argument lacks heft.

While McIsaac testified that he "didn't take any exception to the, to the train trestle,"[4] McIsaac Dep.131:16-18, a reasonable jury could conclude that track

---

[3] Seizing on McIsaac's concession that the plank "could have become unnailed at th[e] instant [he stepped on it]," McIsaac Dep. 142:2-8, CSX also argues that it "cannot be charged with notice of a defect . . . caused by [McIsaac] stepping on the board and therefore non-existent at any time beforehand." Def.'s Mot. at 7. The argument disregards Lydick's testimony that the plank may well have been unsecured prior to the accident. Lydick Dep. 56:14-16, 58:5-7. In any event, the issue is not whether CSX had actual notice that the plank was loose; rather, the element of foreseeability is satisfied if it had notice (or reason to know) of the deterioration of the trestle and if the unsecured plank was within the realm of the risk presented by that deterioration.

[4] Specifically, McIsaac testified as follows.
Q: Did you notice anything wrong with this particular plank?
A: No.
Q: Did you observe that the north end was unnailed?
A: No.
Q: Or unsecured in any fashion?
A: No, It's just a typical wooden train trestle. I didn't take any exception to the, to the train trestle.
Q: Right. So as you're looking at it getting ready to step on it you take no exception to it and then you notice no defects?
A: None.
   [ . . . ]
A: . . . There was [sic] no obstructions. It didn't look like it was rotting away.
   [ . . . ]
A: The planking was in tact [sic]. It wasn't splintered. It didn't appear to be rotten.

5

inspectors, who "may not be certified bridge inspectors, but . . . have a working knowledge of [bridge inspection]," Lydick Dep. 36:8-9, are better qualified than McIsaac to make the determination whether a bridge is safe. *See also* Lydick Dep. 99:10-11 (noting that FRA inspectors "did some bridge inspections . . . when we was [sic] in the training classes). In fact, after reviewing photographs taken of the trestle shortly after the accident, Lydick agreed that it had deteriorated to such a state that it should have alerted track inspectors to the potential danger.[5] Lydick explained:

> [I]f you see a bridge like this that's deteriorated to the point it was and then these – you know, the – it wasn't secured. I mean, on a monthly walking inspection, being that close to it, [track inspectors] should be able to recognize that. . . .
>
> [W]hen you look at a board like this, you know it's got nail kill in it and it's deteriorated around them, and the nails are rusty. And you can see that it's something that should be reported to the bridge department, something – probably bad footing order should have been put on it at a minimum.

Lydick Dep. 36:21-37:1, 38:11-17.

There is more. An August 2008 CSX bridge inspection report indicates that

---

McIsaac Dep. 131:10-22, 156:1, 18-19.

[5] CSX maintains that because the post-accident photos show the plank raised at a forty-five degree angle, they do not mirror the condition of the trestle at the moment of McIsaac's accident. The court fails to discern the relevance of this point. Lydick acknowledged that it was unlikely that the plank was in a raised position when McIsaac stepped on it. *See* Lydick Dep. 55:12-58:23.

"Bridge Number: 49.47-304130" had a "plankloose [sic]" and that the walkway was in "poor" condition with a loose handrail. Pl.'s Opp. - Ex. F. The inspector had given the walkway a "B" grade, signifying the need for preventative maintenance. Pl.'s Opp. - Ex. F. The parties dispute whether the report (which was produced in response to a request for information regarding inspection of the trestle involved in the accident) in fact refers to the trestle at issue.[6] CSX vigorously argues that "[t]he report references walkway replacement work (specifically the installation of metal grating), a clear indication that the inspection report covers and refers to multiple walkways on the same bridge, not just the [wooden] walkway at issue." Def.'s Reply to Pl.'s Opp. at 1. The argument, however, involves a factual dispute that the jury must resolve.[7]

---

[6] The relevant interrogatory asked:

> State the date the trestle bridge involved in the incident in question was last inspected prior to the date of the occurrence, including in your answer the name and job title of the person doing such inspection. If said inspection was recorded in written form consider this a Request for Production of same.

Pl.'s Interrog. No. 25. CSX, preserving its objection, answered by indicating "that the trestle where Plaintiff was injured was last inspected on August 1, 2008," and including a copy of the disputed report with its response.

[7] McIsaac also points out that the other trestles in the vicinity had been upgraded with metal grating by the time of his accident, presumably because of their poor condition, from which the jury might infer that the trestle at issue was in

*Causation*

CSX next argues that McIsaac is unable to prove that his injuries were caused by anything other than prior trauma or the normal process of aging. It is undisputed that McIsaac suffered low back injuries in 1992 and 1995 while employed by Conrail, a railroad with which CSX subsequently merged,[8] and that in exchange for execution of a release agreement, McIsaac settled all claims relating to these injuries for $65,000 and $35,000, respectively.[9] McIsaac's treating physicians also attribute his lower back and occasional lower extremity pain to one or both of two underlying conditions: lumbar disc bulges and degenerative changes to the lumbar spine similarly poor condition.

---

[8] *See generally Commonwealth of Pennsylvania v. Surface Transp. Bd.*, 290 F.3d 522 (3d Cir. 2002) (detailing circumstances of merger).

[9] Pursuant to those agreements, McIsaac

> release[d] and forever discharge[d] the said Consolidated Rail Corporation [Conrail], its predecessor, affiliated and subsidiary companies and any and all other parties, associations and corporations jointly or severally liable, from all claims, demands, actions and causes of action of every kind whatsoever and including, but without limitation of the foregoing, all liability for damages, costs, expenses and compensation of any kind, nature or description now existing or which may hereafter arise from or out of injuries and damages, known or unknown, permanent or otherwise, sustained or received by him.

Def.'s Mot. - Ex B (1992 release); Def.'s Mot. - Ex. C (1995 release).

(specifically osteophytes, facet hypertrophy and arthropathy, and disc desiccation). According to CSX, this testimony "overwhelmingly indicates" that these conditions are the result of the prior released injuries or the natural progression thereof. Def.'s Mot. at 11. Because "[McIsaac's] pain is caused by preexisting conditions and degenerative changes and not the isolated February 2009 trauma," CSX argues that his present claim necessarily fails. Def.'s Mot. at 10.

McIsaac's response is two-fold. First, he underscores the fact that the 1992 and 1995 agreements do not release CSX from liability for "new" injuries and argues that, as a matter of law, new injuries include any aggravation of pre-existing injuries that resulted from the 2009 accident.[10] The court agrees. Under established First Circuit precedent, a plaintiff is entitled to recover damages for incremental harm caused by the aggravation of a preexisting condition. *Stevens*, 97 F.3d at 601-602 (concluding that preclusion of a claim based on aggravation "would prevent the plaintiff from recovering damages for the aggravation in what the factfinder has determined to be

---

[10] Plaintiff also argues that because CSX is not Conrail's predecessor, an affiliated and/or subsidiary company, or a jointly and severally liable entity, it is not able to avail itself of the release agreements. This argument misses the mark. Under accepted corporate law principles, the purchaser of the assets of another corporation assumes the debts and liabilities of the transferor where the transaction is a merger of two entities. *See Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc.*, 313 F.3d 616 (1st Cir. 2002). Thus, for purposes of claims arising from the 1992 and 1995 injuries, CSX and Conrail are one and the same entity.

a meritorious case" and "defeat the remedial purpose of the statute."). While the 1992 and 1995 releases preclude McIsaac from recovering for any pain and impairment attributable to the natural progression of his prior injuries, they do not apply to "potential future claims the employee might have arising from injuries known or unknown by him," *Babbitt v. Norfolk & Western Ry. Co.*, 104 F.3d 89, 93 (6th Cir. 1997), including the aggravation of preexisting injuries resulting from the new accident. *See Richardson v. Missouri Pacific R. Co.*, 186 F.3d 1273, 1278 (10th Cir. 1999).

McIsaac also argues that, contrary to CSX's contention, there is evidence from which a jury could find that his current symptomology is the direct result of the 2009 accident. He emphasizes, as he testified in his deposition, that he did not experience radicular pain following his 1992 and 1994 injuries and that, in fact, those injuries were asymptomatic for nearly fifteen years prior to 2009. Although two examining doctors (including McIsaac's pain management specialist) classified his symptomatic conditions as preexisting or degenerative, or both,[11] McIsaac offers the affidavit of

---

[11] Dr. Ping Jing, McIsaac's pain management physician, diagnosed him with lumbar facet arthropathy, a degenerative condition of facet joints resulting from normal wear and tear of the spine. *See* Jing. Dep. 39:10-21, 42:4:-23. Dr. Medhat Kader, who performed an independent medical examination of McIsaac following the 2009 accident, similarly concluded that his pain was caused by preexisting degenerative conditions that have been present in McIsaac's spine for a number of years. *See* Kader Dep. 25:12-28:7. Dr. Kader also expressly opined that McIsaac did

a third physician, Dr. Michael Kennedy, his primary orthopedist. Dr. Kennedy opines that, "based on a reasonable degree of medical probability, . . . the February 16, 2009 work related incident aggravated Mr. McIsaac's pre-existing degenerative changes in his low back to [the] point where those changes became symptomatic," and that "the symptoms that Mr. McIsaac has experienced in his low back since February 16, 2009 are the result of the work-related incident that occurred on that date." Kennedy Aff., ¶ 15-16.

CSX responds to the Kennedy affidavit by invoking the so-called "sham affidavit doctrine," asserting that Dr. Kennedy's affidavit contradicts his earlier deposition testimony and therefore cannot be relied upon to defeat summary judgment. In this regard, the First Circuit has held that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). Whether the doctrine extends to statements of uninterested witnesses like Dr. Kennedy the court need not decide, as it perceives no direct conflict between Dr. Kennedy's earlier deposition and subsequent affidavit. *Cf. Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.

---

not sustain any new injury in February 2009. Kader Dep. 33:2-14.

1986) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.").

Dr. Kennedy testified at his deposition that McIsaac suffers from a number of preexisting, degenerative pathologies. But he did not, as CSX contends, go so far as to state that these pathologies are the sole cause of McIsaac's current symptoms. To the contrary, Dr. Kennedy indicated that "[t]here's some other stuff in his back that wasn't present in [a] 1995 [scan]," including a disk bulge and annular fissures, Kennedy Dep. 41:14-15, and that some of McIsaac's symptoms were not present prior to the 2009 accident. *See* Kennedy Dep. 75:15-76:7. When questioned by CSX's counsel whether he agreed "that in all probability a majority of the symptoms that [plaintiff] has is related to a majority of [his preexisting L4-5 and L5-S1 pathology]," Dr. Kennedy stated, "I would say some of them. I don't know about majority." Kennedy Dep. 41:21-42:1. Moreover, Dr. Kennedy's affidavit provides a response to a question he was not asked at his deposition, namely, whether McIsaac's current symptoms are the result of an aggravation of his preexisting injuries and not merely a manifestation of their natural progression. Based on his affirmative response, as well as McIsaac's own testimony, a reasonable jury could find that his current symptomology was caused, at least in part, by the 2009 accident.

ORDER

For the foregoing reasons, CSX's motion for summary judgment is <u>DENIED</u>.

The Clerk will issue a trial notice and schedule a pretrial conference.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE